IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DESIGN IDEAS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:15-cv-03093 |
| | ) | |
| MEIJER, INC. and | ) | |
| WHITMOR, INC., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on Defendants' Motion in Limine to Exclude the Testimony of B. Brett Heavner (d/e 162) and Motion in Limine to Exclude the Testimony of Duncan Still (d/e 163). The Court GRANTS IN PART the motion to exclude Heavner's testimony. Heavner may testify regarding the practice and procedure of the United States Patent and Trademark Office (PTO), but his testimony regarding his interpretation of the PTO's handling of Plaintiff's trademark application for the SPARROWCLIPS mark would not be helpful to the trier of fact. The motion to exclude Still's testimony is denied.

# I. BACKGROUND

Plaintiff Design Ideas, Inc. filed a First Amended Complaint against Defendants Meijer, Inc. and Whitmor, Inc. alleging copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101, et seq., unfair competition under the U.S. Trademark Act, 15 U.S.C. §§ 1051, et seq., and violations of the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201, et seq. (DMCA). The First Amended Complaint also contains state law claims asserting unfair competition, violations of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1, the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2, and breach of contract.

Plaintiff served upon Defendants the expert reports of B. Brett Heavner and Duncan Still. Defendants moved to exclude the testimony of Heavner and Still.

# II. LEGAL STANDARD

"The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in Daubert [v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).]" Bielskis v. Louisville Ladder, Inc., 663 F.3d 887, 893 (7th Cir. 2011). To determine whether to admit expert testimony, this Court must

examine whether (1) "the witness is qualified,"(2) "the expert's methodology is scientifically reliable," and (3) "the testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" Myers v. Ill. Cent. R.R. Co., 629 F.3d 639, 644 (7th Cir. 2010) (quoting Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007)). The test is a flexible one. Bielskis, 663 F.3d at 894 (the district court performs a gatekeeping function when determining whether to exclude expert testimony). The party that proffers an expert's testimony must establish the admissibility of the testimony by a preponderance of evidence. Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009).

To determine whether a witness is qualified as an expert, the court must compare the area in which the witness has "superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990). "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." Walker v. Soo Line R.R. Co., 208 F.3d 581, 591 (7th Cir. 2000).

To aid courts in assessing the reliability of scientific expert

testimony, the Supreme Court, in Daubert, set forth a non-exhaustive list of "guideposts" for consideration: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community. Daubert, 509 U.S. at 593-94; see also Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002). In addition to these factors, the 2000 Advisory Committee's Notes to Federal Rule of Evidence 702 suggest that a court also consider (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"; (7) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (9) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (10) "[w]hether the field of expertise claimed by the

expert is known to reach reliable results for the type of opinion the expert would give." Fed. R. Evid. 702 Advisory Committee's Notes (2000 amends.) (internal quotation marks omitted). Because the Daubert inquiry is a flexible one, an expert's testimony need not satisfy each of the above factors to be admissible. Chapman, 297 F.3d at 687; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999) (""In other cases, the relevant reliability concerns may focus upon personal knowledge or experience").

### III. ANALYSIS

**A.    The Motion to Exclude the Testimony of B. Brett Heavner is Granted In Part**

On April 3, 2017, Plaintiff served upon Defendants the expert report of B. Brett Heavner, a practicing trademark attorney with the firm of Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. In Heavner's Report, he provides an overview of PTO trademark practices and procedures. Heavner also provides his opinion about the meaning of the PTO examining officer's actions regarding Plaintiff's registration application for the SPARROWCLIPS mark. For example, Heavner states that, because the examining attorney did not refuse registration of SPARROWCLIPS based on lack of

distinctiveness, mere descriptiveness, or other grounds, the examining attorney determined that the SPARROWCLIPS mark is either inherently distinctive when viewed as a whole or has acquired distinctiveness. Report ¶ 31. Heavner also states that the examining attorney retained the Section 2(f) claim only as to the term SPARROW in the record, which indicated the Examining Attorney's belief that "this was sufficient to establish acquired distinctiveness in the event that the term SPARROW could somehow be deemed descriptive." Id. ¶ 37. Heavner states that the Examining Attorney's position is consistent with the law and that the law presumes that Plaintiff's 2(f) claim was sufficient to establish acquired distinctiveness. Id. Heavner states it is his opinion that the SPARROWCLIPS mark is distinctive, either due to status as an inherently distinctive arbitrary mark or due to acquired distinctiveness based on longstanding substantially exclusive use. Id. 41.

Heavner states that he examined the specimens submitted to the PTO, including the packaging and promotional materials displaying the SPARROWCLIPS mark, and concluded that the "examining attorney was justified in viewing [Plaintiff's] specimens

as establishing trademark usage of SPARROWCLIPS. Id. ¶ 38. Heavener concludes that Defendants are using CANARY CLIPS as a trademark within the meaning of the Lanham Act. Id. ¶ 40.

Heavner also offers the opinion that the PTO regularly treats words trademarks linked to the decorative shape of a product as inherently distinctive by granting registrations, giving as examples GOLDFISH, LUCKY CHARMS, and DIPPIN' DOTS. Id. ¶ 35. Heavner also states his opinion that Defendants' affirmative defenses are meritless. Id. ¶ 41.

Defendants move to exclude Heavner's testimony. Defendants do not challenge Heavner's qualifications or methodology but only that the testimony contains inadmissible legal conclusions and is not helpful to determining any facts at issue in the case.

First, Defendants argue that testimony regarding the practices and procedures before the PTO is not helpful to the determination of any facts at issue in this case. Second, Defendants argue that Heavner's opinion whether the SPARROWCLIPS mark is distinctive and qualified for trademark protection is a wholly inadmissible legal conclusion. As examples of Heavner's legal conclusions, Defendants specifically identify the following statements:

- The term SPARROW has no relationship to the product, "clips" and thus should be categorized as an inherently distinctive mark.

- The fact that the clip features a decorative bird-shaped top does not render the term SPARROW to be descriptive of the clips. The PTO regularly treats word trademarks linked to the decorative shape of a product as inherently distinctive by granting registrations on the Principal Register without disclaimers or Section 2(f) claims.

- [T]he SPARROWCLIPS wording functions as a trademark to distinguish the source of the clips from competitors as required by the Lanham Act . . . . The wording has all the indicia of trademark usage, including distinctive bolder type face, contrasting colors or boldness, and prominent location on packaging to create a commercial trademark impression . . . . The SPARROWCLIPS mark does not fall within the categories of non-trademark matter (such as informational working, ornamental background, model/grade designation, or universal symbols) that would justify an examining attorney issuing a refusal.

- [T]he SPARROWCLIPS mark is distinctive, either due to status as an inherently distinctive mark or due to acquired distinctiveness based on longstanding substantially exclusive use.

- Consequently, Defendants['] affirmative defenses in this regard are meritless.

Mot. at 2, citing Heavner Report ¶¶ 34, 35, 38, 41.

Plaintiff disagrees with Defendants' characterization of Heavner's Report, stating that, "Mr. Heavner does not offer his opinion on the distinctiveness of the SPARROWCLIPS mark, but

- The term SPARROW has no relationship to the product, "clips" and thus should be categorized as an inherently distinctive mark.

- The fact that the clip features a decorative bird-shaped top does not render the term SPARROW to be descriptive of the clips. The PTO regularly treats word trademarks linked to the decorative shape of a product as inherently distinctive by granting registrations on the Principal Register without disclaimers or Section 2(f) claims.

- [T]he SPARROWCLIPS wording functions as a trademark to distinguish the source of the clips from competitors as required by the Lanham Act . . . . The wording has all the indicia of trademark usage, including distinctive bolder type face, contrasting colors or boldness, and prominent location on packaging to create a commercial trademark impression . . . . The SPARROWCLIPS mark does not fall within the categories of non-trademark matter (such as informational working, ornamental background, model/grade designation, or universal symbols) that would justify an examining attorney issuing a refusal.

- [T]he SPARROWCLIPS mark is distinctive, either due to status as an inherently distinctive mark or due to acquired distinctiveness based on longstanding substantially exclusive use.

- Consequently, Defendants['] affirmative defenses in this regard are meritless.

Mot. at 2, citing Heavner Report ¶¶ 34, 35, 38, 41.

Plaintiff disagrees with Defendants' characterization of Heavner's Report, stating that, "Mr. Heavner does not offer his opinion on the distinctiveness of the SPARROWCLIPS mark, but

only the conclusions of the Examining Attorney inherent in the PTO's registration of Plaintiff's mark." Pl. Resp. at 4 (d/e 159)). According to Plaintiff, Heavner's Report addresses three points:

- The PTO and its internal employee's (Examining Attorney's) examining practices;

- Defendants' allegations of non-distinctiveness in the context of PTO trademark examination procedure; and

- Facts within the record comporting with the PTO's practice on its examination of trademarks and Plaintiff's application and registration of its mark.

Id. Plaintiff contends that this testimony does not consist of inadmissible legal conclusions but of statements derived from the PTO's trademark application process and the PTO's examination of Plaintiff's mark.

The Court finds that Heavner's testimony regarding PTO trademark practices and procedures, as outlined in paragraphs 17 through 30 of the Report, would be helpful to the trier of fact, who is likely to be uninformed on the subject of trademark applications. See Sam's Wines & Liquors, Inc. v. Wal-Mart Stores, Inc., No. 92 C 5170, 1994 WL 529331, at *9 (Sept. 27, 1994) (finding the expert could testify about the technical aspects of applying for and obtaining a federal trademark registration); Am. Cruise Lines, Inc.

v. HMS Am. Queen Steamboat Co. LLC, No. 13-cv-324 , 2017 WL 3528606, at *6 (D. Delaware Aug. 16, 2017) (noting that expert testimony on the policies and procedures of the PTO is the type of expert testimony courts generally admit). The Court will also allow Heavner to testify about other marks that have been registered. See Decl. ¶ 35 (the portion of the paragraph identifying 14 registrations of marks without disclaimers or Section 2(f) claims).

That leaves Heavner's testimony on the conclusions of the Examining Attorney inherent in the PTO's registration of the SPARROWCLIPS mark. Heavner essentially concludes, based on his review of the registration application, that the Examining Attorney must have determined that the SPARROWCLIPS marks is either inherently distinctive or acquired distinctiveness. This testimony would not be helpful to the trier of fact, as this Court has found on summary judgment—filed contemporaneously with this Opinion—that the PTO registered Plaintiff's mark under Section 2(f), meaning that the PTO found that the mark had acquired distinctiveness. See Registration Certificate (d/e 169-15) (noting "SEC 2(F) As to 'SPARROW'" and that no claim is made to the use of "CLIPS" apart from the mark as shown).

Therefore, while Heavner will be permitted to testify regarding the PTO trademark practice and procedure (paragraphs 17 through 30) and the registrations of other marks (paragraph 35), the Court strikes the remainder of his testimony (paragraphs 31 through 41).

**B.   The Motion to Exclude the Testimony of Duncan Still is Denied**

In April 2017, Duncan Still submitted his expert report providing an assessment of the alleged historical and future losses of Plaintiff resulting from Defendants' copyright infringement. See Report at 1 (d/e 167). Still is a principal of the business consulting firm BIGTR33 Inc. and a Chartered Management Accountant with a Practicing Certificate granted by the Chartered Institution of Management Accountants. He also received a Master in Business Administration (MBA) in Finance and Marketing from New York University (Stern School of Business). He reports over 25 years of management experience in industry, including budgeting, forecasting, and product profitability studies.

Still's Report contains two parts. Part One reflects Still's calculations of the profits made by Whitmor and retailers, including Meijer, from selling CANARY CLIPS. Still calculated these amounts

as $9,285.86 for Whitmor and $4,809.78 for Meijer.[1]

To put Part Two of Still's Report in context, the Court must explain Plaintiff's theory of damages for the copyright infringement claim. Plaintiff seeks actual damages to include the two years of lost net profits from selling non-SPARROWCLIPS product to Meijer. Plaintiff contends that such damages are causally related to the infringement because Meijer threatened Plaintiff with the loss of all future Meijer business if Plaintiff defended an anticipatory lawsuit filed by Meijer to invalidate Plaintiff's copyright and continued this litigation. Plaintiff contends that Meijer thereafter ceased doing business with Plaintiff.

Part Two contains Still's calculation of marginal profits lost by Plaintiff for a period of two years following the cessation of business between Plaintiff and Meijer. Still used June 1, 2015 as the date business ceased.

---

[1] Still also identifies profits earned by other retailers from selling CANARY CLIPS, namely H.G. Buying, MarMax, and Marshalls. Report at 5. Defendants argue in their summary judgment motion that a defendant is not liable for the profit made by another. Def. Mem. at 33 (d/e 169) (citing Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 519 (9th Cir. 1985) (applying the predecessor to § 504 of the Copyright Act and holding that "each defendant is severally liable for his or its own illegal profit; one defendant is not liable for the profit made by another") (emphasis omitted)). Plaintiff does not address the issue.

Still states that lost sales for the two-year period commencing June 1, 2015 were estimated using a regression analysis. The data Still used was the actual monthly invoice amounts from December 2007 to May 2015. No adjustments were made to remove the initial Sparrow Clips sales made by Plaintiff to Meijer or to add lost Sparrow Clips sales going forward because Still did not believe this would have a material impact.

Still states that the results of the regression analysis were forecasted sales of $1,367,463 for the period of June 2015 to May 2016 and $1,491,633 for the period of June 2016 to May 2017. Actual orders made and invoiced during that period were deducted from the estimates, giving a net deficit in total expected sales of $2,760,580.

Still applied a margin of 31.3%, which he derived from document DI022001 (d/e 186, page 19 of 136). Document DI022001 lists Meijer's Annual Sales from 2011 to 2016 by invoice, cost, and margin, and calculates a percentage margin. Still calculated the total margin percentage as 31.3% based on document DI022001. Still calculated variable expenses at 5% of margin. He noted that most of the costs not already considered in

calculating the margin are of a fixed nature.  Variable costs were calculated at 5% to cover possible variable costs, such as packing materials and extra hours worked by hourly employees.  These calculations resulted in a marginal profit of $820,858.49.

Defendants move to strike and exclude Still's proposed testimony in its entirety because his Report is not based on reliable principles and methods but on unadorned conclusions and unsupported calculations.  Defendants claim that Still's Report does not satisfy the Rule 26 standards.  Defendants also argue that Still's Report does not meet the <u>Daubert</u> standards for admissibility because (1) Still's proposed testimony is not the product of reliable principles and methods; (2) Still fails to explain the assumptions contained within the Report; and (3) the proposed expert testimony is not based upon sufficient facts or data.

1. <u>The Report Complies With Rule 26</u>

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), an expert witness must prepare and sign a written report containing, among other things, (1) a complete statement of all opinions the witness will express and the basis and reasons for them, (2) the facts and data considered by the witness in forming the opinions,

and (3) any exhibits that will be used to summarize and support the opinions. Fed. R. Civ. P. 26(a)(2)(B)(i), (ii), (iii). The purpose of the report is to "convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." Walsh v. Chez, 583 F.3d 990, 994 (7th Cir. 2009).

Defendants assert that Still does not express the basis for his opinions, does not identify the facts and data considered, and does not "show his work." However, the Court finds that the Report complies with Rule 26.

In Part One, Still determines the profits made by Whitmor and retailers from selling CANARY CLIPS. In Part Two, Still determines the marginal profits lost by Plaintiff for a period of two years following the cessation of business in May 2015. Still considered the documents identified in Appendix A of his Report (filed under seal at docket entry 186), which include invoices and bills of lading from the parties.

For Part One, Still lists the unit sales, the price per unit, the and total sales (based on invoices). He also considered the cost per unit, the invoiced cost, landing costs (which he explains how he

calculated), applies a 5% variable expense (which he explains) and calculates a marginal profit.

For Part Two, Still used the actual monthly invoice amounts from December 2007 to May 2015. He used a regression analysis to estimate lost sales after June 1 2015. See Manpower, Inc. v. Ins. Co. of Penn., 732 F.3d 796, 806 (7th Cir. 2013) ("Regression analysis permits the comparison between an outcome (called the dependent variable) and one or more factors (called independent variables) that may be related to that outcome.")

Still identifies the margin and variable expenses used and the reasons for those figures. The Court finds the Report sufficient to comply with Rule 26.

2. Still's Testimony is Admissible Under Daubert

Defendants also argue that Still's testimony is inadmissible under Daubert. Defendants assert that (1) the analysis is not the product of reliable principles and methods; (2) Still fails to explain the assumptions contained within the report; (3) the report is not based on sufficient facts or data.

Plaintiff responds that the specific variables used go to weight, not admissibility. According to Plaintiff, the data Still used is

sufficiently outlined by Bates label as to how specific calculations are made.  Pl. Resp. at 12 (d/e 180).

The Court finds that Still's testimony is admissible under Daubert.  Reliability is "primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." Manpower, 732 F.3d at 806.

For Part One, Still identifies the data he used, listed on his chart the total sales, cost per unit, invoice cost, margin percentage, and variable expense used from the data to calculate Whitmor's profits.  Still also listed the total sales, costs, margin, and variable expenses used from the data to calculate the retailers' profits.  Still defines the relevant terms and explains the assumptions he made.

For Part Two, Still used a regression analysis to forecast sales for the period of June 2015 through May 2017.  Still identified the data used and the assumptions he made.  Still identified the margin used and explained how he calculated the variable expenses.

While some of Defendants' criticisms of the Report have some basis, the Court finds that the criticism goes more to the "soundness of the factual underpinnings" and the "correctness of

the expert's conclusions," which are matters to be determined by the trier of fact, rather than a question of the validity of the methodology employed. Manpower, 732 F.3d at 806 (quoting Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000)). Therefore, the Court will not exclude Still's testimony.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion in Limine to Exclude the Testimony of B. Brett Heavner (d/e 162) is GRANTED IN PART. Heavner may testify regarding the practice and procedure of the PTO and about other marks the PTO has registered. Heavner may not testify regarding his interpretation of the PTO's handling of Plaintiff's trademark application for the SPARROWCLIPS mark would not be helpful to the trier of fact. The Motion in Limine to Exclude the Testimony of Duncan Still (d/e 163) is DENIED.

**ENTERED: July 23, 2018**

**FOR THE COURT:**

    *s/Sue E. Myerscough*
    **SUE E. MYERSCOUGH**
    **UNITED STATES DISTRICT JUDGE**